## BARKER v. STANT.

### In re JOE S. KITE CO., Inc.

(Circuit Court of Appeals, Fourth Circuit. January 13, 1925.)

#### No. 2296.

1. **Bankruptcy ⊸188(3)—Agreement between partners for giving of security to retiring partner held to give latter no equitable lien on general assets of corporation thereafter organized.**

An agreement between partners, on dissolution of firm, providing for deposit of collateral notes securing payment of agreed price, *held* to give retiring partner no equitable lien on the general assets in bankruptcy of a corporation subsequently organized by the remaining partner, though it or the remaining partner received payments on the collateral notes without authority, especially as no valid parol agreement for such lien could be made, in view of Code Va. 1919, § 5194.

2. **Bankruptcy ⊸188(3)—Creditor not entitled to equitable lien on general assets of bankrupt corporation, because of latter's failure to substitute other collateral as agreed.**

Creditor of bankrupt corporation *held* not entitled to lien on general assets in hands of trustee in bankruptcy merely because the corporation and the individual who organized it breached a trust agreement, whereby collateral notes were to be deposited as security, by not substituting other collateral for notes collected.

3. **Bankruptcy ⊸188(3)—Creditor of bankrupt, dealing with corporation as substituted debtor, held not entitled to attack conveyance from debtor to bankrupt corporation.**

A creditor cannot claim an equitable lien on assets of bankrupt corporation because original debtor, an individual, turned over to the corporation all his assets without notice to creditors or compliance with Code Va. 1919, § 5187, where such transfer was not attacked within six months, as required by the statute, and the creditor thereafter dealt with the corporation as a substituted debtor.

4. **Bankruptcy ⊸145(1)—Bankrupt corporation held not liable as indorser on collateral, in addition to indebtedness for which collateral was pledged.**

An agreement whereby remaining partner promised to pay retiring partner named sum, and to deposit as collateral security solvent secured notes approved by trustee, *held* not to render the promisor, or his successor, a bankrupt corporation, liable as an unqualified indorser of the collateral notes in a sum in addition to original indebtedness.

Appeal from the District Court of the United States for the Western District of Virginia, at Abingdon, in Bankruptcy; Henry Clay McDowell, Judge.

In the matter of the estate of the Joe S. Kite Company, Incorporated, bankrupt. A claim by J. M. Barker, Jr., to an equitable lien on the assets of the estate opposed by Donald T. Stant, trustee, was denied by the District Court, and claimant appeals. Affirmed.

W. H. Robertson, of Warrenton, Va. (Morison, Morison & Robertson and H. H. Haynes, Jr., all of Bristol, Va., on the brief), for appellant.

Donald T. Stant, of Bristol, Va., pro se.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

WOODS, Circuit Judge. Joe S. Kite Company, Incorporated, was adjudged

bankrupt on a petition filed January 12, 1923. J. M. Barker, Jr., claimed an equitable lien for $22,008.16 on the entire assets, valued at $12,500. As an alternative he claimed an unsecured debt of $28,776.70, or at least $22,008.16, if the lien should be denied. The District Court adjudged that the bankrupt was indebted to Barker as an unsecured creditor to the amount of $11,485.17 as of January 12, 1923.

The material facts on which Barker rests his claim to an equitable lien are not in dispute. Prior to February 1, 1921, J. M. Barker and Joe S. Kite were copartners doing business under the name of Kite-Barker Motor Company, in Bristol, Va. On that date Barker sold his interest to Kite for $29,893.56 and the assumption by Kite of all listed and known debts of the firm. The terms of sale were expressed in a formal written agreement. As required by the agreement, Kite paid $9,300 in cash or its equivalent, and for the remainder gave six notes for $3,000 each and one note for $2,593.56, payable in sequence semiannually on February 1st and August 1st of each year. The agreement provided:

"In order to secure the due and punctual payment of the notes of the party of the second part at maturity the parties hereto have agreed that the said party of the second part shall, upon the execution of this agreement, deposit with the trustee, hereinafter constituted, as collateral security, solvent notes, approved by the trustee, which are secured by valid chattel mortgages or retention of title of automobiles sold, and for the payment of which the said collateral notes were executed, and therewith the chattel mortgages or retention of title agreements securing the payment of said notes, in at least the total aggregate sum of $21,000, which said collateral notes shall be held by the said trustee hereinafter constituted, as collateral security, securing the due and punctual payment. * * *

"The said trustee is hereby authorized, as and when the said collateral notes deposited with him mature, provided no installments of interest or principal sum of any of the notes of the party of the second part to the party of the first part are due, to accept, and allow the substitution, by the party of the second part, of other similar notes as collateral security for the payment of the said notes of the party of the second part, and thereupon to permit the withdrawal by the party of the second part, of any of the notes theretofore deposited as collateral security: Provided, that the collateral notes withdrawn from the trustee mature within not more than thirty days from the date the substitution is effected; and provided, further, that the notes so substituted shall be solvent notes and of the same character as the collateral notes withdrawn and approved by the trustee.

"The object of this provision is to permit the collection, in the due course of business, by the party of the second part, of the collateral notes maturing under the life of this agreement, and, to affect as slightly as possible the continuation of the party of the second part's business without impairing the security of the party of the first part."

R. W. Kelly was designated as trustee under the contract. The trustee was not authorized to receive payment of the notes, but the duty was imposed on him, in case of default in payment of principal or interest, to declare all the notes due, and, on the request of Barker, to sell all the collateral notes then held by him and credit the net proceeds of sale on the notes of Kite. Kite deposited with the trustee, in accordance with the agreement collateral notes amounting to $21,000, taken for the purchase money of automobiles.

In February, 1922, Kite had the business incorporated as the Joe S. Kite Company, Incorporated, and Barker and the trustee thereafter dealt with the corporation as they had before dealt with Kite individually. On February 1, 1923, after the filing of the petition in bankruptcy, Barker requested the trustee to sell the notes held by him as collateral and apply the proceeds of sale to the balance of $15,032.66, then due on Kite's notes. The notes were sold by the trustee to Barker for $3,400, and the purchase money was credited on the notes of the Kite Company, leaving a balance of $11,632.66 due thereon to Barker. The face value of the notes sold was $30,000, but it turned out that Kite had collected thereon about $20,000. This $20,000 was used by the Kite Company in the general conduct of its business, which amounted to about $300,000 a year.

[1] Barker alleges in his petition, and Weingardner, office manager of the Kite Company, testified, that the collections were not kept separate, but were used for the general purposes of business including payments on real estate and payments on notes in banks. It thus appears that, even if Kite and the Kite Company had no right to receive payments on the collateral notes held by the trustee for Barker, the evidence af-

fords no basis for an equitable lien on the assets in the hands of the trustee in bankruptcy. There is no evidence that any of the money was used for the purchase of the property now in the hands of the trustee in bankruptcy, or any article of it. Moreover, the written agreement of sale, providing security for the credit portion of the purchase money, negatives any intention that Barker should have a lien on the general assets by providing for the security of collateral notes to be lodged with the designated trustee. The written agreement does not provide that either Barker or Kelly, trustee, should receive payments on the collateral notes. On the contrary, it made provision for Kite to collect the collateral notes in the course of his business; Barker relying on Kite's promise to give to the trustee other notes in the place of those collected.

The failure of Kite to comply with his promise to give the substituted notes furnishes no more basis for the claim of a lien on the general assets of the bankrupt than would his breach of promise to pay money from the proceeds of sales made in the course of the bankrupt's business. The record furnishes no evidence that the Kite Company had at the time of the bankruptcy any notes which could have been substituted for those collected by it. There was no written or parol agreement, either express or implied, for such a lien, and even if a parol agreement could be implied, it would be void under section 5194 of the Code of Virginia. Norfolk & P. T. Co. v. White, 113 Va. 102, 73 S. E. 467, Ann. Cas. 1913E, 655.

[2] The failure of Kite and the Kite Company to substitute other collateral for the notes they had collected under authority from Barker was a mere breach of promise, which conferred no lien on the general assets in the hands of the trustee in bankruptcy standing in the shoes of a lien creditor. Page v. Old Dominion Trust Co., 257 F. 402, 168 C. C. A. 442.

[3] Barker claims, further, that he is a creditor of Joe S. Kite, not of Joe S. Kite Company; that the assets of Joe S. Kite were illegally turned over to the corporation; and that he has the right of payment therefrom in preference to the creditors of the corporation. The basis of this claim is that the stock of goods and other assets of Joe S. Kite were sold and turned over to the corporation in February, 1922, without the notice to him as a creditor required by section 5187 of the Virginia Code of 1919, and without compliance with that statute in other particulars. It seems clear that the failure to comply with the statute cited is not available to Barker for at least two reasons: He dealt with the corporation as his debtor, substituted for Kite personally. The statute limits the time within which a creditor may attack such a transfer to six months. The transfer to the corporation was made more than six months before Barker attacked it.

[4] As already stated, the original debt owed Barker was $29,893.56. It is not disputed that the amount remaining due on the original debt, after allowing all proper credits, including the $3,400 of purchase money of the collateral notes bought by Barker, was correctly found by the District Judge to be $11,485.17, as of January 12, 1923. But Barker claims that the bankrupt corporation as indorser is liable to him in the sum of $28,776.60 on the collateral notes purchased, at the sale made by Kelly, trustee. The form of the indorsement or transfer of these notes to the trustee does not clearly appear. But we think, when the agreement of sale by Barker to Kite is read as a whole, it clearly appears that it was not the intention of the parties that Kite should incur the double liability of maker of the original notes and indorser of the collateral notes. Kite promised to pay $29,893.56 and to "deposit" "as collateral security solvent notes approved by the trustee which are secured by valid chattel mortgages or retention of title of automobiles sold." This expression of the nature of the security negatives the intention that Kite should be liable not only for the purchase money of Barker's interest in the business, but also as an unqualified indorser on the collateral. We express no opinion whether Kite or Kite Company would have been liable as indorser of the collateral notes to a third person purchasing them.

Affirmed.